**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BODYGUARD PRODUCTIONS, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RCN TELECOM SERVICES, LLC, *et al.*, <br><br> Defendants. | Civ. A. No. 3:21-cv-15310 (GC) (TJB) <br><br> **OPINION** |

CASTNER, District Judge

     **THIS MATTER** comes before the Court upon the Motion to Dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"), filed by Defendants RCN Telecom Services, LLC and RCN Telecom Services of Massachusetts, LLC (collectively, "Defendants"). (Defs.' Mot., ECF No. 28.) Plaintiffs Bodyguard Productions, Inc.; Hitman Two Productions, Inc.; Killing Link Distribution, LLC; LHG Productions, Inc.; Millennium Funding, Inc.; Millennium IP, Inc.; MON, LLC; Nikola Productions, Inc.; Outpost Productions, Inc.; Rambo V Productions, Inc.; SF Films, LLC; Venice PI, LLC; Voltage Holdings, LLC; Wonder One, LLC; YAR Productions, Inc.; and After II Movie, LLC (collectively, "Plaintiffs") opposed (Pls.' Opp'n, ECF No. 30), and Defendants replied (Defs.' Reply, ECF No. 32). The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b).

For the reasons set forth herein, Defendants' Motion is **DENIED** with respect to Counts I, II and IV of Plaintiffs' First Amended Complaint ("FAC") (ECF No. 22), and is **GRANTED** with respect to Count III of Plaintiffs' FAC.

## I.    BACKGROUND

### A.    Procedural History

Plaintiffs filed their original Complaint on August 13, 2021. (ECF No. 1.) In response, Defendants filed a Motion to Dismiss on October 19, 2021 (*see* Defs.' First Mot. to Dismiss, ECF No. 13), which became moot following Plaintiffs' FAC filed on November 15, 2021 (FAC, ECF No. 22). In the FAC, Plaintiffs assert four causes of action: Counts I and II, allege contributory and vicarious copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq.*; Count III seeks a website-blocking injunction pursuant to 17 U.S.C. § 512(j); and Count IV asserts secondary liability under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202. (*See generally* FAC.) In response to the FAC, Defendants filed the instant Motion, which seeks to dismiss all four counts of Plaintiffs' FAC.

### B.    Factual Background[1]

Plaintiffs are the owners of copyrighted works (the "Works"), which are motion pictures listed in Exhibit A to the FAC. (FAC ¶ 50; FAC Ex. A, ECF No. 22-1.)[2] According to the FAC, Defendants operate as an Internet Service Provider ("ISP") whose subscribers use "BitTorrent," a peer-to-peer file-sharing protocol. (FAC ¶¶ 38, 56-71.) A BitTorrent user called an "initial seeder"

---

[1] For the purpose of a motion to dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to the Plaintiffs. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[2] All citations to Exhibits hereinafter refer to the exhibits appended to Plaintiffs' FAC. (*See* ECF Nos. 22-1 through 22-5.)

2

installs BitTorrent's software system, which is called the "BitTorrent Client," on a local device to connect to and manage the BitTorrent file-sharing protocol. (*Id.* ¶ 62.) The initial seeder creates a "torrent" descriptor file using the BitTorrent Client. (*Id.*) The initial seeder then copies the motion pictures from legitimate sources (*id.* ¶ 63), and in the process "often modifies the file title of the Work[s]," or the Copyright Management Information ("CMI") to include a reference to popular websites facilitating piracy, or "torrent sites," such as YTS, Pirate Bay, or RARBG. (*Id.* ¶¶ 64, 72.) Including a reference to the torrent site "enhance[s] the reputation for the quality of [the] torrent files and attract[s] users to [these popular] piracy website[s]." (*Id.* ¶ 64.)

Next, the BitTorrent Client "takes the target computer file, the 'initial seed,' here the copyrighted [w]ork, and divides it into identically sized groups of bits known as 'pieces[,]'" before assigning each piece "a random and unique alphanumeric identifier known as a 'hash' and record[ing] these hash identifiers in the torrent file." (*Id.* ¶¶ 65-66.) Pieces of the computer file or copyrighted works are shared among peers using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers. (*Id.* ¶¶ 75-81.) Once a peer has downloaded the entire file, the BitTorrent Client reassembles the pieces, and the peer is able to both view the movie, and act as an "additional seed" to further distribute the torrent file. (*Id.* ¶ 82.)

### 1.    Maverickeye, Plaintiffs' Third-Party Investigator

Plaintiffs engaged Maverickeye UG ("Maverickeye"), a third-party investigator, in order to "identify the IP addresses that [were] being used by those people that [were] using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform Plaintiffs' copyrighted Works." (*Id.* ¶ 83.) "[Maverickeye] used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions." (*Id.* ¶ 84.) Maverickeye then extracted and analyzed the data, and "logged information including the IP addresses, Unique Hash Numbers,

and hit dates that show[ed] that Defendants' subscribers distributed pieces of the copyrighted Works identified by the Unique Hash Number." (*Id.* ¶¶ 85-86.) "Maverickeye's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar." (*Id.* ¶ 89.)

Plaintiffs also engaged Maverickeye to "generate 'Notices of [I]nfringement[]' [(the "Notices")] styled per 17 U.S.C. § 512(c)(3) of the [DMCA] to be sent to service providers of IP addresses where [Maverickeye] confirmed infringement of copyright protected content." (*Id.* ¶ 113.) The Notices included: "at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which include[d] the altered [CMI], the IP address and port number where infringement was confirmed and the time of infringement down to the second." (*Id.* ¶ 114 (citing Ex. D, ECF No. 22-4).) Maverickeye sent "5,400 notices styled per 17 U.S.C. § 512(c)(3) to Defendants' designated abuse contact informing Defendants that many of their subscribers were actively utilizing their service to infringe Plaintiffs' Works." (*Id.* ¶¶ 43, 119.) The Notices identified IP addresses that were assigned to Defendants by the American Registry of Internet Numbers ("ARIN").[3] (*Id.* ¶¶ 28, 119.) Plaintiffs allege that "Defendants continued to provide service to their subscribers despite knowledge that their subscribers were using the service to engage and facilitate massive piracy of Plaintiffs' copyright protected Works." (*Id.* ¶ 128.) Plaintiffs claim that "Defendants' failure to terminate or take any meaningful action against their subscribers resulted in a cascade of piracy of Plaintiffs' Works." (*Id.* ¶ 131.)

---

[3] Plaintiffs assert that "Defendants are members of [ARIN], which is a nonprofit, member-based organization that manages and distributes Internet number resources such as Internet Protocol ("IP") addresses and Autonomous System Numbers." (FAC ¶ 28 (citing Ex. B, ECF No. 22-2).) "The ARIN records show that ARIN has directly allocated numerous IP address blocks to RCN, including 33 Networks and 11 Autonomous System Numbers." (*Id.* ¶ 33.)

In addition to Maverickeye, Plaintiffs allege that the operator of the YTS website confirmed that at least one of Defendants' subscribers used the YTS website to "upload and download Plaintiffs' copyrighted Work[s][.]" (*Id.* ¶ 73.) Attached to the FAC is an Exhibit that provides: the name of one of Plaintiffs' Works ("Rambo V: Last Blood (2019)"); an (RCN) IP address (207.237.11.70); an alphanumeric hash function, a date and timestamp of the file download; the city, state, and zip code of the IP address; and an email account. (*See* FAC Ex. C.)

### 2. Defendants' Policies

According to the FAC, Defendants can control the conduct of their subscribers by terminating a subscriber's account at any time for committing any "prohibited or abusive activities or failing to pay for the service." (FAC ¶¶ 132-33 (citation omitted).) The FAC includes a screenshot of Defendants' "Acceptable Use Policy," detailing "RCN's Online Policies, including [a] list of Prohibited/Abusive Activities." (*Id.* ¶ 133.) The Acceptable Use Policy states:

> As explained in your subscriber agreement, your use of RCN Internet Access Service must be governed by all applicable laws and regulations, including all applicable local, state, national, and international laws and regulations. In addition to other applicable laws, this includes all laws relating to copyright, trademark, trade secrets, obscenity, defamation, rights of privacy and publicity, false advertising, and fraud.

(*Id.*) Plaintiffs also include a screenshot of an excerpt of Defendants' Internet Access Agreement ("IAA"), which provides that "RCN retains the right, but not the obligation, to restrict or terminate your Access Service at any time, if RCN, in its sole discretion, determines that you are in violation of this Agreement and/or RCN's Online Policies." (*Id.* ¶ 134, IAA ¶ 3.) The IAA further provides that "RCN reserves the right to disconnect and/or temporarily suspend an account from RCN's service without warning if in RCN's sole discretion there is a reasonable suspicion that such disconnection or suspension would prevent or interrupt a violation of application law, this

Agreement, or RCN's Online Policies." (*Id.* ¶ 134, IAA ¶ 5.)  Finally, the IAA provides that "[s]ubject to the provision of the [DMCA] and any other applicable laws and regulations, RCN reserves the right to remove or block access to, either permanently or temporarily, any files which RCN suspects or which a third party alleges are associated with a violation of the law[.]" (*Id.* ¶ 134, IAA ¶ 6.)

According to the FAC, "Defendants monitor and/or control the content that their subscribers access or which websites they visit[.]" (*Id.* ¶ 136.)  Also, "Defendants have the ability to determine whether their subscriber's service is being used for operating file-sharing programs such as BitTorrent and whether the subscriber's service is being used to distribute copies of copyright protected content." (*Id.* ¶ 137.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that the Court may dismiss a complaint "for failure to state a claim upon which relief can be granted."  To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  When considering a Rule 12(b)(6) motion, a district court conducts a three-part analysis. *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Iqbal*, 556 U.S. at 675).  "Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).  "Third, 'whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly

give rise to an entitlement [to] relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). A complaint that does not demonstrate more than a "mere possibility of misconduct" must be dismissed. *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

## III.    DISCUSSION

In their Motion, Defendants assert that Plaintiffs' FAC does not plausibly allege claims of direct, contributory, or vicarious liability under the Copyright Act, 17 U.S.C. § 101, *et seq.*, that Plaintiffs' claim for injunctive relief is a remedy, not a separate cause of action, and that Defendants are not liable for violations of 17 U.S.C. § 1202 of the DMCA. The Court addresses Defendants' contentions in turn.

### A.    Direct Infringement

As a threshold matter to addressing Defendants' Motion, the Court must first address whether the FAC plausibly alleges "direct infringement" by Defendants' subscribers. "Contributory and vicarious infringement are theories of secondary liability for copyright infringement that 'emerged from common law principles and are well established in the law.'" *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016), *cert. denied*, 138 S. Ct. 975 (2018) (quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)). "Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party." *Id.* (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001)). "Thus, to prove a claim of contributory or vicarious infringement, a plaintiff must first show direct infringement by a third party." *Id.* However, "[a] plaintiff does not need to sue the third party to file suit against a defendant under theories of secondary liability." *Broad. Music Inc. v. Hemingway's Café, Inc.*, No. 15-6806, 2017 WL 2804951, at *4 (D.N.J. June 28, 2017) (citing *Arista Recs., Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 416 (D.N.J. 2005)).

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991); *In re McGraw-Hill Glob. Educ. Holdings, LLC*, 909 F.3d 48, 66-67 (3d Cir. 2018); *Live Face on Web, LLC v. Emerson Cleaners, Inc.*, 66 F. Supp. 3d 551, 554 (D.N.J. 2014).

Regarding the first element, Plaintiffs allege that they "are the owner[s] of the copyrights in the Works as shown in Exhibit A either through "work for hire agreement[s], assignments and/or mergers[,]" and that "the Works are the subject of copyright registrations[.]" (FAC ¶ 50.) Exhibit A identifies a list of motion pictures by title together with the name of the owner of the copyright as well as the registration numbers from the United States Copyright Office. (*See* Ex. A, ECF No. 22-1.) The Court finds Plaintiffs have adequately pled ownership of a valid copyright. (*See id.*); *see also UMG Recordings, Inc. v. RCN Telecom Servs., LLC* ("*RCN I*"), No. 19-17272, 2020 WL 5204067, at *6 (D.N.J. Aug. 31, 2020) (finding that the plaintiffs adequately pled that they owned a valid copyright based on a list of copyrighted recordings that included the registration number from the United States Copyright Office); *see also Arista Recs., Inc. v. Flea World, Inc.*, No. 03-2670, 2006 WL 842883, at *8 (D.N.J. Mar. 31, 2006) (citing 17 U.S.C. § 401(c)) ("When asserting ownership of a copyright, the existence of copyright registration certificate issued from the United States Copyright Office is *prima facie* evidence of the validity of the party's copyright and of the facts stated in the certificates, including ownership of the copyright.").

With respect to the second element, "[c]opying refers to the act of infringing any of the exclusive rights that accrue to the owner of a valid copyright, as set forth at 17 U.S.C. § 106, including the rights to distribute and reproduce copyrighted material." *RCN I*, 2020 WL 5204067, at *5 (quoting *KipCon, Inc. v. D.W. Smith Assocs., LLC*, No. 17-3190, 2017 WL 5129888, at *3

8

(D.N.J. Nov. 6, 2017)). "An individual who violates these exclusive rights is an infringer." 17 U.S.C. § 501; *see RCN I*, 2020 WL 5204067 at *6 (citing *Napster, Inc.*, 239 F.3d at 1014). Accepting the allegations of the FAC as true and construing the facts in Plaintiffs' favor, Plaintiffs have plausibly pled that Defendants' subscribers create illegitimate files of the Works from legitimate copies (*see* FAC ¶ 63 ("[t]he initial user or seeder of a file use[s] a process referred to as 'ripping' to create a copy of motion pictures from either Blu-ray or legal streaming services")), and then shares the files among other users using the BitTorrent protocol (*see id.* ¶ 82 (once a user has downloaded the full file and the pieces are reassembled, the user acts as another source of distribution to further users).

Pursuant to the FAC, Plaintiffs' third-party investigator, Maverickeye, identified the IP addresses that were being used by individuals using the BitTorrent protocol and the internet to reproduce, distribute, display or perform Plaintiffs' Works. (*Id.* ¶ 83.) Maverickeye "used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions" (*id.* ¶ 84), and then extracted and analyzed the data, and "logged information including the IP addresses, Unique Hash Numbers, and hit dates that show[ed] that Defendants' subscribers distributed pieces of the copyrighted Works identified by the Unique Hash Number" (*id.* ¶¶ 85-86). "Maverickeye's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar." (*Id.* ¶ 89.) According to the FAC, "Defendants' subscribers distributed at least pieces of each of Plaintiffs' Works over network connections provided by Defendants to other peers[.]" (*Id.* ¶¶ 92-95.) At the pleading stage, the Court finds these allegations sufficient. *See RCN I*, 2020 WL 5204067, at *6 (denying the defendants' motion to dismiss based on allegations that the plaintiffs' independent copyright enforcement company that

monitored BitTorrent systems for infringing activities had repeatedly obtained a copy of the infringing file that was the subject of an infringement notice).

Defendants argue that Plaintiffs fail to state the necessary element of direct infringement because they do not allege the identities of the alleged infringing subscribers; rather, they "identify the alleged direct infringers by IP address only[.]" (Defs.' Moving Br. 9, ECF No. 28-1.) Defendants' main argument revolves around a case decided by the United States Court of Appeals for the Ninth Circuit, *Cobbler Nevada, LLC v. Gonzales*, which holds that "[a] plaintiff must allege something more to create a reasonable inference that a subscriber is also an infringer." 901 F.3d 1142, 1145 (9th Cir. 2018). Essentially, Defendants argue, proof that copyright infringement was conducted at a particular IP address requires evidence to show *which* subscriber committed the infringement, and the FAC fails to connect that "the allegedly infringing activity at that IP address was performed by an RCN subscriber." (Defs.' Moving Br. 9.) Defendants further cite two cases within this district demonstrating that "a plaintiff's mere identification of an internet subscriber linked to an allegedly infringing IP address is insufficient to state a claim for copyright infringement." (*Id.* at 12 (citing *Malibu Media, LLC v. Peled*, No. 18-141, 2020 WL 831072, at *5-6 (D.N.J. Feb. 20, 2020); *Malibu Media v. Park*, No. 17-12107, 2019 WL 2960146, at *6 (D.N.J. July 9, 2019)).

Plaintiffs ask the Court to reject the line of reasoning articulated in *Cobbler*, and instead rely on Defendants' instruction in their IAA that "the subscriber is solely responsible for all users regardless of whether there is evidence the infringement was committed by someone else[.]" (Pls.' Opp'n Br. 20, ECF No. 30.) Specifically, Plaintiffs argue that *Cobbler* is inapplicable because there, the suit was brought against an individual subscriber of an ISP, while here, the suit is brought against the ISP. (*See id.*) Plaintiffs point to three cases, *UMG Recordings, Inc. v. Grande*

*Communications Networks, LLC* ("*Grande II*"), which distinguished *Cobbler* because in *Cobbler*, the suit was brought against an individual subscriber of an ISP, whom, as soon as he discovered the infringement, attempted to identify the infringer, and when he could not, directed his residents to stop infringing, whereas *Grande II* was a suit brought against an ISP defendant, 384 F. Supp. 3d 748, 767 n.6 (W.D. Tex. 2019); *RCN I*, which noted this same distinction and also directed that "*Cobbler* did not address whether a large ISP can be held liable for contributory infringement," 2020 WL 5204067, at *10 n.5; and *Sony Music Entertainment v. Cox Communications, Inc.*, which explained that "the fundamental conundrum in *Cobbler* was finding and naming the right defendant; here, there is no dispute or hesitation in naming [the ISP defendant]," 426 F. Supp. 3d 217, 235 (E.D. Va. 2019).

Defendants respond that *RCN I*, *Grande II*, and *Cox* all relate to a different holding than in *Cobbler* regarding the conduct necessary to show contributory copyright infringement by an ISP. (Defs.' Reply 3-4, ECF No. 32.) Defendants also urge the Court to "reject Plaintiffs' attempt to rely on RCN's terms of use," "because they appear nowhere in Plaintiffs' [FAC]," but "even if they had been included," the result would be that Plaintiffs had pled tertiary liability, that RCN is "secondarily liable for its subscriber's secondary liability." (*Id.* at 4-5 (citing *David v. CBS Interactive, Inc.*, No. 11-9437, 2012 WL 12884914, at *4 (N.D. Cal. July 13, 2012); *In re Napster, Inc. Copyright Litig.*, No. 00-1369, 2001 WL 36593841, at *2 (N.D. Cal. July 9, 2011)).)

The Court finds that the facts in *Cobbler*, *Park*, and *Peled* are distinguishable from this case. In this case, unlike in *Cobbler*, *Park*, *and Peled*, Plaintiffs seek to impose liability against the ISP, via contributory and vicarious liability, and not an individual subscriber. Plaintiffs sufficiently allege that Defendants' subscribers, or those using their accounts, employ Defendants' internet service to copy and distribute the Works to which Plaintiffs hold legitimate copyrights.

(FAC ¶¶ 56-71, 90-95.)  The procedural posture in this case is more similar to *Grande II*, *RCN I*, and *Cox*, where the courts noted that the reasoning in *Cobbler* was inapplicable in suits brought against ISP defendants.  *See Grande II*, 384 F. Supp. 3d at 767 n.6 (noting that the defendant's reliance on *Cobbler* was misplaced as *Cobbler* involved an individual internet subscriber who took no affirmative steps to foster infringement whereas the ISP continued to provide internet service to customers despite knowledge of repeated infringement); *RCN I*, 2020 WL 5204067, at *10 n.5 (noting that *Cobbler* was inapposite as *Cobbler* involved an individual subscriber as opposed to the actual ISP defendant in this case).  Although the *Park* and *Peled* cases are from this district, those cases are likewise distinguishable as they involved claims asserted against individual subscribers and involved unopposed motions for default judgments filed against the subscribers who were proceeding *pro se*.  *See Peled*, 2020 WL 831072, at *5-6; *Park*, 2019 WL 2960146, at *4.

Moreover, Plaintiffs advance facts that Defendants explicitly notified their subscribers in the IIA that accounts identified as infringing could be terminated, regardless of the identity of the infringing individual:

> RCN reserves the right to disconnect and/or temporarily suspend **an account** from RCN's service without warning if in RCN's sole discretion there is a reasonable suspicion that such disconnection or suspension would prevent or interrupt a violation of applicable law, this Agreement, or RCN's Online Policies.
>
> Subject to the provision of the [DMCA] and any other applicable laws and regulations, RCN reserves the right to remove or block access to, either permanently or temporarily, any files which RCN suspects or which a third party alleges are associated with a violation of the law, this Agreement or RCN's Online Policies or **with the account responsible for such violation**.

(FAC ¶ 134 (emphasis added).)  The fact that Defendants reserve the right to terminate the accounts of infringing subscribers suggests, at least at the early pleading stage, that Defendants do, in fact,

contemplate responsibility over their accounts regardless of the individual accessing the account. Therefore, Plaintiffs have plausibly pled direct infringement by Defendants' subscribers.

### B.    Count I: Contributory Infringement

"One infringes contributorily by intentionally inducing or encouraging direct infringement[.]" *Grokster*, 545 U.S. at 930 (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). "To establish a claim of contributory copyright infringement, a plaintiff must show: (1) a third-party directly infringed the plaintiff's copyright; (2) the defendant knew that the third-party was directly infringing; and (3) the defendant materially contributed to or induced the infringement." *Leonard*, 834 F.3d at 386-87 (citing *Gershwin Publ'g Corp.*, 443 F.2d at 1162). The Court has already determined that Plaintiffs have plausibly alleged direct infringement by Defendants' subscribers. Therefore, the Court will turn to the two remaining factors that Plaintiffs must allege.

#### 1.    Knowledge Requirement

"Contributory infringement requires that the secondary infringer know or have reason to know of direct infringement." *Flea World, Inc.*, 2006 WL 842883, at *14 (internal quotation marks omitted) (citing *Napster, Inc.*, 239 F.3d at 1020). "Actual knowledge is not required; constructive knowledge of infringement is sufficient to meet this burden." *Broad. Music, Inc.*, 2017 WL 2804951, at *4. "In addition, turning a 'blind eye' to infringement is the equivalent of knowledge." *RCN I*, 2020 WL 5204067, at *7 (quoting *Flea World, Inc.*, 2006 WL 842883, at *14) (further citations omitted). Indeed, "courts have held that the knowledge element for contributory infringement is met in those cases where a party has been *notified* of specific infringing uses of its technology and fails to act to prevent such uses, or willfully blinds itself to such infringing uses."

13

*Id.* (quoting *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 979 (E.D. Va. 2016), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018)).

Defendants argue that "mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability," and in the "absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement[.]"  (Defs.' Moving Br. 14 (citing *Grokster*, 545 U.S. at 937, 939 n.12).)

Plaintiffs respond that Maverickeye "sent over 5,400 Notices to Defendants concerning infringements of copyright protected Works including Plaintiffs at IP addresses assigned to Defendants," and that each notice included the information needed to identify the infringing activity.  (Pls.' Opp'n Br. 21-22 (citing FAC ¶¶ 43, 124, 140; Ex. D).)  Specifically, Plaintiffs allege that Defendants were provided information detailing more than the potential to infringe, as Maverickeye's notices contained details of "IP addresses, Unique Hash Numbers, and hit dates that show[ed] that Defendants' subscribers distributed pieces of the copyrighted Works identified by the Unique Hash Number."  (FAC ¶¶ 85-86.)

The Court finds that Plaintiffs have stated allegations sufficient to satisfy the knowledge requirement at the pleading stage, based on the allegation that Maverickeye sent notices to Defendants concerning infringement of copyright protected Works at IP addresses assigned to Defendants from ARIN.  (*See* FAC ¶¶ 119-25.)  Also, according to the FAC, "Plaintiffs' counsel sent a letter to Defendant RCN Telecom Services, LLC detailing these concerns and pointing to detailed examples of prolific piracy behavior by subscribers on Oct. 19, 2020."  (*Id.* ¶ 129 (citing Ex. D).)  Plaintiffs claim that Defendants "completely ignored the letter and continued to provide service to even the subscribers engaged in prolific piracy detailed in the letter."  (*Id.* ¶ 130.)  Thus,

the Court finds that Plaintiffs have adequately pled the "knowledge" requirement of contributory infringement.

### 2.     Material Contribution or Inducement

The final element, that "the defendant materially contributed to or induced the infringement," *Leonard*, 834 F.3d at 387 (citing *Gershwin Publ'g Corp.*, 443 F.2d at 1162), has also been adequately pled at this stage. "[A]n actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in direct infringement." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1171 (9th Cir. 2007). "To satisfy the 'material contribution or inducement' requirement of the third element, there must be 'conduct that encourages or assists the infringement.'" *RCN I*, 2020 WL 5204067, at *8 (quoting *Tanksley v. Daniels*, 259 F. Supp. 3d 271, 296 (E.D. Pa. 2017)) (further citation omitted). "[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (citing with approval *Columbia Pictures Indus. v. Aveco, Inc.*, 800 F.2d 59 (3d Cir. 1986)). "[W]here a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, that party knows of and contributes to direct infringement and may be liable for contributory copyright infringement." *Arista Recs. LLC v. Lime Grp.*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011) (internal quotation marks omitted). As in *RCN I*,

> [L]iability may be imposed for intentionally encouraging infringement through specific acts . . . The specific act in question here is the continued provision of internet service to customers. Thus[,] this is not a case of mere refusal to act. [The ISP] acted affirmatively by continuing to sell internet services and continuing to provide internet access to infringing customers.

2020 WL 5204067, at *9 (quoting *Grande II*, 384 F. Supp. at 767) (internal citation omitted).

Defendants cite the "inducement rule" in *Grokster* for the proposition that knowledge of actual infringing is not enough and instead evidence of "purposeful, culpable expression and conduct" are required for a finding of contributory liability.  545 U.S. at 937.  In *Grokster*, the defendants were companies that distributed free software that allowed computer users to share electronic files through peer-to-peer networks.  *Id.* at 919.  The Court determined that summary judgment in favor of the defendants was not warranted due to evidence showing that the defendants acted with a purpose to cause copyright violations by encouraging use of software suitable for illegal use – namely, internal company documents noting that the defendants were seeking to fill a demand for copyright infringement, failure to develop filtering tools or other mechanisms to diminish the infringing activity, and the defendants ability to make money by selling advertising space (by directing ads to the screens of computers employing their software).  *Id.* at 939-40.

In *Grokster*, the Supreme Court refined its ruling in *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) to state that "where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement, *Sony*'s rule will not preclude liability."  545 U.S. at 935.  *Sony* centered around the sale of home video tape recorders ("VTR's") to the general public, who would then use the VTR's to record and reproduce copyrighted works.  *Sony*, 464 U.S. at 420.  There, the Supreme Court refused to impose liability on Sony merely because it marketed and sold a product capable of facilitating copyright infringement, finding that "the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes."  *Id.* at 442.  Subsequently, in *Grokster*, the Supreme Court refined the inducement standard outlined in *Sony*, explaining that "*Sony* barred secondary liability based on presuming or imputing intent to cause

16

infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement." *Grokster*, 545 U.S. at 933. "*Sony*'s rule limits imputing culpable intent as a matter of law from the characteristics or uses of a distributed product. But nothing in *Sony* requires courts to ignore evidence of intent if there is such evidence, and the case was never meant to foreclose rules of fault-based liability." *Id.* at 934-35. "In [*Sony* and *Grokster*], once the defendant released the device into commerce, the defendant had no control of the end-user's use of the device (whether for infringing or non-infringing use)." *Flea World, Inc.*, WL 842883, at *15.

Here, Plaintiffs sufficiently allege conduct that encourages or assists infringement, specifically, that "Defendants continued to provide service to their subscribers despite knowledge that their subscribers were using the service to engage and facilitate massive piracy of Plaintiffs' copyright protected Works." (FAC ¶ 128.) Therefore, Plaintiffs have pled that they informed Defendants of the infringing activity (*see id.* ¶¶ 117-25), and that Defendants continued to provide service to these accounts without further inquiry (*see id.* ¶¶ 130-31). The Court finds that at this stage, Plaintiffs have alleged an adequate factual basis to support their claim of contributory infringement.

### C.    Count II: Vicarious Copyright Infringement

A party "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S at 930 (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)). "To establish vicarious infringement, a plaintiff must prove that the defendant had (1) the right and ability to supervise or control the infringing activity; and (2) a direct financial interest in such activities." *Leonard*, 834 F.3d at 388

17

(citing *Grokster*, 545 U.S. at 930, 930 n.9; *Am. Tel. and Tel. Co. v. Winback & Conserve Program*, 42 F.3d 1421, 1441 (3d Cir. 1994)).

### 1.    Right and Ability to Supervise

Beginning with the first element, "[t]he requirement that a defendant have the right to supervise or control is not limited to traditional agency relationships such as master-servant or employer-employee." *Leonard*, 834 F.3d at 388. "Indeed, vicarious infringement liability has been imposed on a person or entity 'even in the absence of an employer-employee relationship . . . if the person or entity has the right and ability to supervise the infringing activity.'" *Id.* (citations omitted).

"[U]nder *Grokster*, a defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10, Inc.*, 508 F.3d at 1173. Here, Plaintiffs have adequately pled this element by alleging "Defendants monitor and/or control the content that their subscribers access or which websites they visit," (FAC ¶ 136), and "Defendants have the ability to determine whether their subscriber's service is being used for operating file-sharing programs such as BitTorrent and whether the subscriber's service is being used to distribute copies of copyright protected content" (*id.* ¶ 137). According to Defendants' policies, Defendants reserve the right "to remove or block access to, either permanently or temporarily, any files which [Defendants] suspect[] or which a third party alleges are associated with a violation of the law[.]" (*Id.* ¶ 134) (*see Flea World, Inc.*, 2006 WL 842883, at *10 (holding that an owner or operator of a flea market had the requisite ability to control vendors of infringing music, and noting that the defendants "issued rules in which they expressly reserved the right to inspect all merchandise offered for sale at the market and eject any vendor who failed to comply with these rules").

### 2.    Direct Financial Interest

Turning to the second element, "[f]inancial benefit exists where the availability of infringing material acts as a draw for customers." *Parker v. Google, Inc.*, 242 F. App'x 833, 837 (3d Cir. 2007). "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *RCN I*, 2020 WL 5204067, at *11 (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)). "[T]he central question of the 'direct financial benefit' inquiry in this case is whether 'the infringing activity constitutes a draw for subscribers, not just an added benefit.'" *Id.* "However, there is 'no requirement that the draw be substantial.'" *Id.* (citing *Parker*, 242 F. App'x at 837) (internal citations and quotation marks omitted).

Defendants argue that "[t]he only financial benefit that Plaintiffs allege is the receipt of flat fees for internet service, which remains the same whether RCN's subscribers infringe Plaintiffs' copyrights or not." (Defs.' Moving Br. 17 (citing FAC ¶¶ 152-55); *Ellison*, 357 F.3d at 1079). Defendants further argue that the FAC "fails to plausibly allege that RCN profited directly from the alleged infringement;" and thus, "any financial benefit from the alleged infringement is attenuated or incidental, not direct." (Defs.' Moving Br. 17-18.) Defendants rely on the Third Circuit's decision in *Parker*, where the court denied the plaintiff's vicarious copyright infringement claim against Google, holding that the plaintiff "failed to allege that Google had a direct financial interest in the purported infringing activity." (*Id.* at 18-19 (citing *Parker*, 242 F. App'x at 837).) Defendants also cite to *UMG Recordings, Inc. v. Bright House Networks, LLC*, in which the court dismissed the plaintiffs' vicarious liability claim holding that the plaintiffs failed to plead facts establishing that the defendant ISP obtained "an obvious and direct financial interest

19

in or that it [drew] subscribers to its internet service platform by offering the availability of infringing conduct." (*See* Defs.' Reply Br. 11-13 (citing *Bright House*, No. 19-710, 2020 WL 3957675, at *4, 6 (M.D. Fl. July 8, 2020) (internal punctuation and citation omitted)).

Plaintiffs rely on *RCN I*, wherein the court denied the defendants' motion to dismiss as to the plaintiffs' vicarious liability claim because the plaintiffs alleged that "[t]he ability of subscribers to download and distribute [the p]laintiffs' copyrighted works illegally through RCN's service, without limit, has served as a valuable draw for infringing subscribers, and has allowed RCN to attract, retain and charge higher fees to those subscribers[.]" 2020 WL 5204067, at *12 (citation omitted); (*see* Pls.' Opp'n Br. 27-28). Additionally, Plaintiffs note that in *RCN I* the plaintiffs pled that the defendants' "failure to adequately police its infringing subscribers was a draw for customers to purchase [the defendants'] internet services." *Id.*

The allegations in this case are similar to those in *RCN I*. Plaintiffs allege, "[t]he ability of subscribers to use Defendants' high-speed service to infringe Plaintiffs' Works without having their services terminated despite multiple notices being sent to Defendants acts as a powerful draw for subscribers of Defendants' service." (FAC ¶ 170.) Plaintiffs further allege in this case that Defendants advertise their higher downloading and uploading speed, which is at an increased cost to "Download an HD movie in a Snap" and to "Download a TV show, an album or photos in a Flash," and that this draws customers who wish to utilize high-speed internet service to facilitate piracy on the BitTorrent network. (*Id.* ¶¶ 153-155.) When construing the allegations of the FAC in Plaintiffs' favor, the Court finds that Plaintiffs have plausibly pled that Defendants had a direct financial interest in the purported infringing activity.

### D.    Count III: Application for Website Blocking Injunction

Defendants assert that "the Court should dismiss Plaintiffs' claim for injunctive relief (Count III) because injunctive relief is a remedy, not a cause of action." (Defs.' Moving Br. 25.) Defendants support their position with direction from the United States Court of Appeals for the Third Circuit, which explains "an injunction is a remedy rather than a cause of action, so a separate claim for injunctive relief is unnecessary." (*Id.* (quoting *Chruby v. Kowaleski*, 534 F. App'x 156, 160 n.2 (3d Cir. 2013)).) Defendants also argue that "Plaintiffs have failed to plead facts (as opposed to legal conclusions) sufficient to support injunctive relief." (*Id.* (citing FAC ¶¶ 174-85).)

Plaintiffs respond by proposing that the cases relied upon by Defendants are "cases in which a party attempted to obtain equitable relief without a legal basis." (Pls.' Opp'n Br. 37.) Plaintiffs reinforce that they "are not requesting an injunction under the equitable powers of this Court." (*Id.*) Instead, Plaintiffs are seeking an injunction pursuant to 17 U.S.C. § 512(j), which provides, "[t]he following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies under this section[.]" (*Id.* (citing FAC ¶¶ 2, 173-83).) "Thus, even if Defendants established a safe harbor and [are] 'not subject to monetary remedies,' the Court can still grant an application for the (1)(A) and (B) injunctions of 17 U.S.C. § 512(j)." (*Id.*) Further, Plaintiffs assert that the Copyright Act "explicitly provide[s] the Court with authority to grant an order 'restraining the service provider from providing access to a subscriber . . . who is engaging in infringing activity . . . by terminating the accounts of the subscriber' and 'restraining the service provider from providing access, by taking reasonable steps . . . to block access, to a specific, identified, online location outside the United States.'" (*Id.* at 37-38 (citing 17 U.S.C. §§ 512(j)(1)(A)(ii) & (B)(ii)).) Thus, Plaintiffs are seeking an injunction "ordering Defendants to terminate the account[s] of subscribers for which they

21

receive three or more notices and block access to the notorious foreign piracy websites their subscribers use[.]" (*Id.* at 38.)

The Court agrees with Defendants that Plaintiffs' Count Three should be dismissed as Plaintiffs' application for an injunction is a request for a remedy and is not a separate cause of action. *See Chruby*, 534 F. App'x at 160 n.2. The statutory provision Plaintiffs rely upon, 17 U.S.C. § 512(j), specifically states that the "following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies under this section[.]" Section 502 is titled, "**Remedies** for infringement: Injunctions." *Id.* (emphasis added). Based on the plain language of the statute, an injunction is a possible remedy for infringement and does not constitute a separate cause of action. Further, Plaintiffs' "Prayer for Relief" requests that the Court "enter permanent injunctions enjoining Defendants from continuing to contribute to infringements of the Plaintiffs' copyrighted Works and DMCA violations." (FAC, Prayer for Relief (A).) Therefore, Plaintiffs will not be prejudiced by dismissing Count Three as Plaintiffs' FAC seeks an injunction as a remedy in this case. Plaintiffs Count Three will be dismissed.

### E.     Count Four: Violations of the DMCA, 17 U.S.C. § 1202

Plaintiffs assert violations of sections 1202(a) and (b) of the DMCA. (*See* FAC ¶¶ 184-202.) Under section 1202(a), "[n]o person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement — (1) provide [CMI] that is false, or (2) distribute or import for distribution [CMI] that is false." Section 1202(b) provides,

> No person shall, without the authority of the copyright owner or the law—
>
> (1) intentionally remove or alter any [CMI],

(2) distribute or import for distribution [CMI] knowing that the [CMI] has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that [CMI] has been removed or altered without authority of the copyright owner or the law,

knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

Plaintiffs allege that Defendants' subscribers violated these sections of the DMCA, and that Defendants are secondarily liable for their subscribers' conduct. (*See* FAC ¶¶ 193-98.) Defendants argue that this claim should be dismissed because the DMCA does not allow for secondary liability; and that even if section 1202 were to permit secondary liability, Plaintiffs fail to allege that Defendants or any of its subscribers directly violated the DMCA. (*See* Defs.' Moving Br. 8.) The Court addresses these arguments in turn.

### 1.    Secondary Liability Under the DMCA

Defendants argue that section 1202 of the DMCA does not provide for secondary liability because the statute is silent in this regard and Defendants are not aware of any case finding a defendant secondarily liable under the statute. (*Id.* at 19-22.) Defendants also argue that the text of the DMCA establishes Congress did not intend to "enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component, or part thereof." (*Id.* at 21 (citing 17 U.S.C. § 1201(c)(2)).) Finally, Defendants cite to the legislative history of the DMCA as support that section 1202 was intended to address specific acts and not the liability of persons who provide services. (*Id.* at 22 (citing H.R. Rep. No. 105-551 at 22 (1998) (internal emphasis eliminated)).)

23

In response, Plaintiffs argue that "it is widely established that the [principles] of secondary liability apply for DMCA violations." (Pls.' Opp'n Br. 28.) In support, Plaintiffs cite the decision by the United States Court of Appeals for the Sixth Circuit in *Gordon v. Nextel Communications & Mullen Advertising, Inc.*, 345 F.3d 922 (6th Cir. 2003). (*See id.*) In *Gordon*, the Circuit Court held that a party may be liable for a third-party's direct infringement of section 1202 under the traditional paradigm of vicarious liability imposed under the Copyright Act. (*Id.*) Plaintiffs aver that a number of district courts have cited the holding in *Gordon* with approval. (*Id.* at 29.)

The Court agrees that secondary liability may be found under the DMCA. The DMCA was "designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age." S. REP. 105-190, S. Rep. No. 190, 105th Cong., 2nd Sess. 1998, 1998 WL 239623 (Leg. Hist.) P.L. 105-304, The Digital Millennium Copyright Act of 1998. "Title II of the DMCA clarifi[ed] 'the liability faced by service providers who transmit potentially infringing material over their networks.'" *Id.* at *2. When enacting the DMCA, the Judiciary Committee was "sympathetic to the desire of [ISPs] to see the law of [copyright infringement] clarified" in light of "several cases relevant to service provider liability." *Id.* at *19, 19 n.20 (citing, *e.g.*, *Religious Tech. Ctr. v. Netcom On-line Commc'ns Servs.*, 907 F. Supp. 1361 (N.D. Cal. 1995) (explaining that "[a]lthough there is no statutory rule of liability for infringement committed by others . . . vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another") (further citations omitted). However, the Committee determined that "[r]ather than embarking upon a wholesale clarification of these doctrines, the Committee decided to leave current law in its evolving state and, instead, [] create[d]

24

a series of 'safe harbors,' for certain common activities of service providers" noting that a "service provider which qualifies for a safe harbor, receives the benefit of limited liability." *Id.* at *19; *see also* 17 U.S.C. §§ 512(a)-(d).[4]

Based on the Sixth Circuit's decision in *Gordon* and the legislative history of the DMCA, the Court concludes that the safe harbors limit liability but "do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109, 1109 n.1 (9th Cir. 2007) (citing *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1147 (C.D. Cal. 2002) (citing in turn H.R. Rep. 105-551 and noting that H.R. Rep. 105-551(II) (1998) and S. Rep. 105-190 (1998) are largely

---

[4] The DMCA carves out a safe harbor for a "service provider," *i.e.*, "an entity offering the transmission, routing, or providing of connections for digital online communications[.]" 17 U.S.C. § 512(k)(1)(B). To be eligible for any of the DMCA safe harbors listed in 17 U.S.C. §§ 512(a)-(d), a service provider must meet the following threshold conditions for eligibility, including "the adoption and reasonable implementation of a 'repeat infringer' policy that 'provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network . . . [and] accommodate 'standard technical measures' that are 'used by copyright owners to identify or protect copyrighted works.'" *Viacom Int'l v. Youtube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2012). "Beyond the threshold criteria, a service provider must satisfy the requirements of a particular safe harbor." *Id.*

Defendants briefly address their eligibility under the safe harbor provision, stating "[f]or the entire period relevant to this case, RCN has had in place a safe harbor policy pursuant to the [DMCA], under which RCN terminates the accounts of accused copyright infringers in appropriate circumstances." (Defs.' Moving Br. 6 (citing 17 U.S.C. §§ 512(a), (i)(1)(A)).) To the extent Defendants have asserted safe harbor, the Court finds Plaintiffs have plausibly alleged that Defendants do not qualify. According to the FAC, "[Defendants] ha[ve] adopted a policy that provides for the termination in appropriate circumstances of subscribers and account holders who are repeat infringers," but that Defendants have failed to reasonably implement it, (*see* FAC ¶ 133 (providing an excerpt of Defendants' user agreement, advising subscribers that failure to obey applicable copyright laws may result in account suspension or termination); *see id.* ¶¶ 119-31, specifically ¶ 130 ("Defendants completely ignored the [notice] letter and continued to provide service to even the subscribers engaged in prolific piracy detailed in the letter."); *see also id.* ¶¶ 143-51 (providing "examples of Defendants' failure to reasonably implement the requisite policy)). Therefore, Plaintiffs have adequately pled that Defendants are not eligible for safe harbor under the DMCA to warrant dismissal at this stage of the proceedings.

identical)).  Those doctrines remain viable through common law.  Therefore, secondary liability may be imposed under the DMCA.

### 2.    Direct Infringement under the DMCA

Next, Defendants argue that even if section 1202 were to permit secondary liability, Plaintiffs fail to allege that Defendants or any of its subscribers directly violated the DMCA. (Defs.' Moving Br. 22, 24 (citing *Cobbler*, 901 F.3d at 1145).)  In Count Four of the FAC, Plaintiffs allege that Defendants' subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of Plaintiffs' Works, altered CMI without Plaintiffs' authority and distributed false CMI in violation of sections 1202(a) and (b).  (FAC ¶¶ 184-193.)  To support this allegation, Plaintiffs assert that "[t]he initial seeders of the infringing file copies of Plaintiffs' Works added wording to the file titles to 'brand' the quality of the piracy files he or she released in order to attract further traffic to his or her website." (*Id.* ¶ 97.)  Plaintiffs further allege that the initial seeder would add wording to the file title such as "RARBG" or "YTS" to brand the quality of the piracy files and attract further traffic to the RARBG and YTS websites (*id.* ¶¶ 99-100), and that Defendants' subscribers would then distribute to other peers the altered CMI in the file title (*id.* ¶ 102).  The Court finds that Plaintiffs have sufficiently pled underlying direct infringement of the DMCA by Defendants' subscribers.

### a.    Copyright Management Information

Under the DMCA, CMI "means any of the . . . information [provided in section 1202(c)(1)-(8)] conveyed in connection with copies . . . of a work . . . including in digital form[.]" 17 U.S.C. § 1202(c).  CMI includes the "title and other information identifying the work, including the information set forth on a notice of copyright." *Id.* § 1202(c)(1).

Defendants argue that, though "Plaintiffs' Count IV is based on the alleged falsification or alteration of information in the file names of digital movie files[,]" (Defs.' Moving Br. 22 (citing FAC ¶¶ 96-102)), Plaintiffs have failed to allege it was originally "conveyed in connection with legitimate copies of the copyrighted work" (*id.* (citing § 1202(c))). Defendants rely on a case from the District of Arizona to establish that "for a plaintiff to prove a defendant removed her CMI, she must be able to show it was originally 'conveyed in connection with' the protected work." (*Id.* at 23 (quoting *Powers v. Caroline's Treasures, Inc.*, 382 F. Supp. 3d 898, 903-04 (D. Ariz. 2019)).) Defendants emphasize that Plaintiffs have not alleged facts stating that the "alleged CMI was originally conveyed by Plaintiffs or anyone acting on their behalf." (*Id.*) "In other words, Plaintiffs do not allege that the digital movie files in question were originally legitimate copies (*e.g.*, digital files purchased from a licensed content provider) with CMI provided by Plaintiffs." (*Id.*)

Defendants further argue that Plaintiffs have not alleged that "any CMI was falsified, removed, or altered, as required by section 1202." (*Id.*) Though Plaintiffs have alleged that "RCN subscribers violated the DMCA by distributing movie files with 'added wording' such as the initials RARBG or YTS" (*id.* (citing FAC ¶¶ 98-102)), Defendants argue that these actions are not in violation of section 1202 "because such information is neither false CMI (per section 1202(a))[,] nor does it constitute an alteration or removal of CMI (per section 1202(b))" (*id.*). Defendants contend that Exhibit D to the FAC shows that "the title of each movie at issue—the alleged CMI— was still present in each file name." (*Id.* at 23-24.) Defendants argue that the addition of other information to the file name is not actionable under the plain language of section 1202, because an "addition" is not the same as a "falsification, alteration, or removal" of CMI. (*Id.* at 24.)

Plaintiffs respond that "CMI includes such items as the title of the work, performer, and director[.]" (Pls.' Opp'n Br. 32 (quoting *IQ Grp. v. Wiesner Publ'g, LLC*, 409 F. Supp. 2d 587, 596 (D.N.J. 2006).) Plaintiffs claim that the Third Circuit has broadly held that "a cause of action under section 1202 of the DMCA potentially lies whenever the types of information listed in section 1202(c)(1)-(8) and 'conveyed in connection with copies . . . of a work . . . including in digital form' is falsified or removed, regardless of the form in which that information is conveyed." (*Id.* at 32-33 (citing *Murphy v. Millennium Radio Grp.*, 650 F.3d 295, 305 (3d Cir. 2011).) Plaintiffs also assert that file names were "altered" as that term is commonly used and is consistent with the holdings in *Energy Intelligence Group v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 267 (5th Cir. 2020) and *Hunter Killer Productions, Inc., et al. v. Sabrina Boylan*, No. 20-cv-306 (W.D. Tex. 2021). (*Id.* at 34.)

In *Murphy*, the Third Circuit explained that section 1202 "simply establishes a cause of action for the removal of (among other things) the name of the author of a work when it has been 'conveyed in connection with copies of' the work." 650 F.3d at 302. The Court stated that the section "appears to be extremely broad, with no restrictions on the context in which such information must be used in order to qualify as CMI[,]" and that the purpose of the DMCA, as a whole, was to expand the rights of copyright owners. *Id.* at 303. The United States Court of Appeals for the Fifth Circuit similarly interpreted section 1202 broadly noting that "[n]othing in § 1202 indicates that a digital file name cannot be CMI." *Energy Intel. Grp., Inc.*, 948 F.3d at 277. "Rather, a PDF's file name may be CMI if it is 'conveyed in connection with copies' of the underlying work and contains a 'title and other information identifying the work.'" *Id.* (quoting 17 U.S.C. § 1202(c)(1)).

Defendants' reliance on *Powers v. Caroline's Treasures Inc.*, 382 F. Supp. 3d 898 (D. Ariz. 2019) is unavailing.  (*See* Defs. Moving Br. 22-23.)  In *Powers*, the plaintiff claimed that the defendants altered protected CMI on protected images in violation of 17 U.S.C. § 1202(b) by "remov[ing the plaintiff's] electronic signature and a copyright symbol from the copyrighted works, and replaced them with a notation that said 'Caroline's Treasures.'"  382 F. Supp. 3d at 903.  The district court granted summary judgment in favor of the defendants with regard to removal of CMI because the plaintiff could not demonstrate that her signature and copyright symbol were on the images when the defendants received them from the plaintiff.  *Id.*  The court determined that "[i]n order for a plaintiff to prove a defendant removed her CMI, she must be able to show it was originally 'conveyed in connection with' the protected work."  *Id.* (citations omitted).  However, with respect to the plaintiff's claim of falsification of CMI under section 1202(a), the court denied the defendants' motion for summary judgment.  *Id.* at 906.  The plaintiff alleged that when she discovered her copyrighted works being advertised and sold on third party websites, the works "contained a notation which read 'Caroline's Treasures,'" which constituted replacing CMI with false CMI.  *Id.* at 905.  Defining CMI as "'information conveyed in connection with' a work[,]" the court held that there was a factual dispute about whether the Caroline's Treasures notation constituted CMI, and that the phrase "conveyed in connection with" is not necessarily about the location of the CMI, but whether it "could be interpreted as conveying the title, name of the author, or owner of the work."  *Id.* at 906.

Here, Plaintiffs allege that Defendants' subscribers engaged in peer-to-peer file sharing wherein they altered the title of the work, and then conveyed false or altered CMI in connection with Plaintiffs' protected Works.  (*See* FAC ¶¶ 96-112, 184-93.)  Plaintiffs also include as an exhibit to the FAC a list of file copies with altered CMI.  (*See* Ex. E, ECF No. 22-5.)  Plaintiffs

also allege that the altered titles of the copyrighted works were conveyed via BitTorrent to a swarm of other individuals seeking to pirate the files online. (FAC ¶¶ 96-112.) When construing the allegations of the FAC in Plaintiffs' favor, the Court finds Plaintiffs have adequately pled that the titles of Plaintiffs' Works, constituting CMI under section 1202(c)(1), were altered or falsified in violation of section 1202.

### b.    Defendants' Subscribers' Knowledge

Defendants further argue that Plaintiffs "fail to allege the double scienter required by section 1202(a) and (b)." (Defs.' Moving Br. 24 (citing *Pierce v. Lifezette, Inc.*, 2021 WL 2557241, at *5 (D.D.C. June 2, 2021)).) Defendants contend that Plaintiffs are obligated to come forward with "specific allegations as to how identifiable infringements will be affected." (*Id.* at 24-25 (citing *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673-74 (9th Cir. 2018); *Mills v. Netflix, Inc.*, 2020 WL 548558, at *2 (C.D. Cal. Feb. 3, 2020); *Harrington v. Pinterest, Inc.*, 2021 WL 4033031, at *6 (N.D. Cal. Sept. 3, 2021) (as stated by Defendants, "dismissing section 1202 count because complaint alleged 'nothing more than the possibility of encouraging infringement'")).)

Plaintiffs argue that they have alleged numerous factual allegations that Defendants' subscribers knew "that the website or BitTorrent Client from which [Defendants' subscribers] obtained their torrent files and file copies was distributing illegal copies of the Work with altered CMI," and that, "in at least one case, Defendants' subscriber had registered an account with the piracy websites YTS." (Pls.' Opp'n Br. 35 (citing FAC ¶¶ 73-74, 96-110; Ex. C).)

In *Pierce*, cited by Defendants, the district court held that sections 1202(a) and (b) contain what is referred to as a "double scienter" requirement. *See* 2021 WL 2557241, at *5 (citing *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018); *see also Mango v. Buzzfeed, Inc.*, 970 F.3d 167, 171-72 (2d Cir. 2020)). There, the court stated that under section 1202(a), "a plaintiff

must plausibly allege 'that defendant knowingly provided false copyright information *and* that the defendant did so with the intent to induce, enable, facilitate, or conceal an infringement.'" *Id.* (quoting *Krechmer*, 747 F. App'x at 9) (internal quotations omitted) (emphasis in original). And, with regard to section 1202(b), the court held that a plaintiff must plausibly allege that the removal of CMI was intentional. *Id.* (citing *Fischer v. Forrest*, 968 F.3d 216, 223 (2d Cir. 2020)). The court determined that the plaintiff plausibly alleged a violation of both sections of the statute based on the allegation that the defendant "intentionally removed [CMI,]" that "doing so would conceal the infringement" and the information was "distributed via defendant's Website." *Id.*

In this case, Plaintiffs have pled that Defendants' subscribers, "without authority of the copyright owner or the law . . . intentionally remove[d] or alter[ed] [] CMI," (*see* FAC ¶¶ 96-97 ("A legitimate file copy of each of the Works includes [CMI] indicating the title. The initial seeders of the infringing file copies of Plaintiffs' Works added wording to the file titles to 'brand' the quality of piracy files he or she released and attract further traffic to his or her website.")). Plaintiffs further allege that the subscribers did so "knowing or having reasonable grounds to know that it will induce, enable, facilitate, or conceal an infringement of the federal copyright laws," by asserting that "[t]he initial seeder often modifies the file title of the work to include a wording such as 'FGT', 'RARBG' or 'YTS' in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website[.]" (*Id.* ¶ 64.) "Defendants' subscribers accessed torrent sites including the YTS website to upload and download Plaintiffs' copyrighted Work from IP addresses provided by Defendants." (*Id.* ¶ 73.) "Defendants distributed the subscribers' submissions to other members of the swarm." (*Id.* ¶ 80.) The subscribers knew that the entity included in the false or altered CMI was neither the author nor licensed distributor of Plaintiffs works. (*See id.* ¶¶ 105-07.) "Defendants subscribers

knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtain[] unlicensed copies of the Work." (*Id.* ¶ 109.) "By providing the altered CMI to others, Defendants' subscribers induced, enabled and facilitated further infringements of the Work." (*Id.* ¶ 110.) Thus, Plaintiffs have pled direct infringement under the DMCA by Defendants' subscribers, such that the Court appropriately addresses secondary liability under the same. When construing the allegations of the FAC in Plaintiffs' favor, the Court finds Plaintiffs have adequately pled the double scienter requirement under section 1202.

### 3.    Secondary Liability

Finally, Defendants contend that Plaintiffs have failed to allege facts to sustain a claim for secondary liability against Defendants under section 1202. (Defs.' Moving Br. 22.) Specifically, Defendants assert that "Plaintiffs allege no facts showing that [Defendants]: (1) knew any subscriber had violated section 1202; (2) took any steps to encourage or promote the violation of section 1202; (3) could supervise or control its subscribers' compliance with section 1202; or (4) directly profited from its subscribers violating section 1202." (*Id.* (citing FAC ¶¶ 194-98); *see also* Defs.' Reply Br. 13-14.)

In response, Plaintiffs argue that Defendants had actual knowledge that their subscribers had violated section 1202, because Plaintiffs' agent had sent Defendants notices "that included the specific file name with modified CMI[.]" (Pls.' Opp'n Br. 30 (referencing FAC Ex. D).) The letter from Plaintiffs' counsel specifically explains, "[n]early all of the file titles of the infringing copies have had the [CMI] such as the title of the Work modified or altered to falsely include a reference to a piracy website." (Oct. 19, 2020 Letter 3, FAC Ex. D.) The letter further states, "the

CMI has been modified/altered to falsely refer to the notorious piracy websites YTS and the piracy group STUTTERSHIT in violation of 17 U.S. § 1202 ("DMCA violations")." (*Id.*)

As previously discussed in connection with Plaintiffs' allegations of secondary liability under the Copyright Act, Plaintiffs have also adequately pled secondary liability under the DMCA, and have pled that Defendants materially contributed to the DMCA violations by continuing to provide internet services to their subscribers despite receiving notices of the violations and failing to terminate service consistent with Defendants' policies. (*See* Pls.' Opp'n Br. 31 (citing FAC ¶ 198).) And, Plaintiffs also allege that Defendants directly profited from the violations of section 1202 by again failing to terminate service to its subscribers. (*See id.*)

With respect to the knowledge requirement, again "[a]ctual knowledge is not required; constructive knowledge of infringement is sufficient to meet this burden." *Broad. Music, Inc. v. Hemingway's Café, Inc.*, No. 15-6806, 2017 WL 2804951, at *4 (D.N.J. June 28, 2017). "In addition, turning a blind eye to infringement is the equivalent of knowledge." *RCN I*, 2020 WL 5204067, at *7; *see Flea World, Inc.*, 2006 WL 842883, at *14. The Court finds that Plaintiffs have made allegations sufficient to satisfy the knowledge requirement at the pleading stage based on the allegations that Plaintiffs' investigator, Maverickeye determined that Defendants' subscribers distributed Plaintiffs' Works with altered CMI (*see* FAC ¶¶ 111-112 (citing Ex. E)), and that Plaintiffs' counsel sent a letter to Defendant RCN Telecom Services, LLC detailing Plaintiffs' concerns and examples of piracy behavior in violation of the DMCA (*see id.* ¶ 129 (citing Ex. D)).

Next, Plaintiffs have sufficiently alleged that the subscribers' "removal of the copyright notice was done with the requisite 'know[ledge] or reason[able grounds] to know that the removal would induce, enable, facilitate, or conceal infringement." *Gordon*, 345 F.3d at 927 (quoting

33

§ 1202(b)). "[W]here a computer system operator learns of specific infringing material available on [the] system and fails to purge such material from the system that party knows of and contributes to direct infringement and may be liable for contributory copyright infringement." *RCN I*, 2020 WL 5204067, at *8 (quoting *Lime Grp.*, 784 F. Supp. 2d at 432). Moreover, "a computer system operator can be held contributorily liability if it has *actual* knowledge that *specific* infringing material is available using its system and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Id.* (quoting *Perfect 10, Inc.*, 508 F.3d at 1172 (emphasis in original)). Plaintiffs have alleged that Defendants had actual knowledge (*see* FAC Ex. D), and made no further exertion to deter its subscribers' alleged infringement (*see* FAC ¶¶ 128-31).

Plaintiffs have also adequately pled the elements of control and financial interest. Specifically, that Defendants "ha[ve] the right and ability to supervise the infringing activity," *Parker*, 242 Fed. App'x at 4 (citing *Gershwin Publ'g*, 443 F.2d at 1162), in that Defendants provide the subscribers with the internet service employed to proliferate the piracy of Plaintiffs' copyrighted works. (*See, e.g.*, FAC ¶ 132 ("Defendants can terminate the accounts of their subscribers at any time.").) "Indeed, Defendants explicitly state that they have the right to disconnect or temporarily suspend a subscriber's account, including for DMCA violations," and that "Defendants monitor and/or control the content that their subscribers['] access or which websites they visit." (*Id.* ¶¶ 134 & 136.)

Plaintiffs have also pled, to be able to survive a motion to dismiss, "direct financial interest in the purported infringing activity." *See Parker*, 242 F. App'x at 4 (citing *Gershwin Publ'g*, 443 F.2d at 1162). "Financial benefit exists where the availability of infringing material acts as a draw for customers." *Parker*, 242 F. App'x at 837 (quoting *Ellison*, 357 F.3d at 1078). "There is no

34

requirement that the draw be 'substantial.'" *Id.* (quoting *Ellison,* 357 F.3d at 1079). Plaintiffs assert that "[i]ndeed, the ability of Defendants' subscribers to use Defendants' service to engage in widespread DMCA violations while pirating content without having their services terminated despite multiple notices being sent to Defendants acts as a powerful draw for subscribers of Defendants' service." (FAC ¶ 198.) Therefore, Plaintiffs have adequately pled a direct financial interest by Defendants to survive a motion to dismiss.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Counts I, II, and IV of Plaintiffs' FAC is **DENIED**. Defendants' Motion directed to Count III is **GRANTED**. An appropriate Order will follow.

Dated: October 11, 2022

**GEORGETTE CASTNER**
**United States District Judge**